UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CHRISTOPHER MACCORKLE SMITH,
and A.C.R. PROMOTIONS, INC.,
d/b/a Rough N' Rowdy Brawl
d/b/a Ruckus in the Cage,

         Plaintiffs,

v.                                    Civil Action No. 2:15-cv-06026

STEVEN A. ALLRED, individually
and in his official capacity,
DOUGLAS E. PAULEY, individually
and in his official capacity,
and BRIAN SIMPSON, individually
and in his official capacity,

         Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

         Pending is defendants' motion to dismiss, filed July

6, 2015.


<u>Background</u>


         Plaintiff A.C.R. Promotions, Inc., ("A.C.R.") is a

West Virginia corporation engaged in the business of hosting and

promoting professional, semi-professional, and amateur combat

sports events, including both boxing and mixed martial arts

matches.  A.C.R. promotes events in West Virginia, as well as in

Virginia, North Carolina, Tennessee, Georgia, Alabama, and

Kentucky.  Plaintiff Christopher MacCorkle Smith ("Smith") is

the president and owner of A.C.R.  He has been a licensed fight promoter in West Virginia since 1996.

A.C.R.'s events in West Virginia are subject to regulation and oversight by the West Virginia State Athletic Commission ("the Commission").[1]  The Commission has broad authority to "issue and revoke [a] license to conduct, hold or give boxing or sparring matches or exhibitions," and "[n]o boxing, sparring or exhibition may be conducted, held or given within the state except pursuant to the commission's authority." W. Va. Code § 29-5A-3.  "Every license is subject to rules the commission may prescribe."  Id.  "Each member of the commission [has] the privilege of being present at all exhibitions and matches without charge therefor, and [must], when present, see that the rules are strictly observed."  W. Va. Code § 29-5A-16. "[I]n the event that no member of the commission can be present, the commission may appoint an inspector to be present . . . which inspector [has] the same privilege . . . [as] a member of the commission."  Id.  "The [Commission's] members . . . serve without pay."  W. Va. Code § 29-5A-1.  Defendants Steven A. Allred ("Allred"), Douglas E. Pauley ("Pauley"), and Brian

---

[1] Prior to 1999, the West Virginia State Athletic Commission was called the West Virginia State Boxing Commission.  See W. Va. Code § 29-5A-1 ("The State Boxing Commission, heretofore created, is hereby continued and renamed the State Athletic Commission.").

Simpson ("Simpson")(collectively "the commissioners") are either current or former members of the Commission.

Plaintiffs contend that, after the death of Commissioner Frank Hartenstein in 2008, "the West Virginia Athletic Commission . . . became corrupted . . . and members of the Commission [became] focused . . . on personal gain and graft." Pl. Compl. ¶ 16-17. They allege that, starting in March 2009, the commissioners began using the power of their official positions to "extort[] property and money" from the plaintiffs. Id. ¶ 26. Specifically, plaintiffs charge the commissioners with demanding fees in excess of those authorized by the relevant state statute; hiring more officials (who must be paid by fight promoters) than necessary or required; demanding "VIP Passes" for family members, friends, business associates and political allies; forcing promoters to pay fees to the commissioners' family members; and unethically assigning themselves as judges and referees in prominent matches. Id. ¶ 17.

The plaintiffs initiated this action on May 11, 2015. They contend that the commissioners' conduct violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq, through a pattern of violations of the Hobbs Act, 18 U.S.C. § 1951 et seq, and the Federal Wire Fraud

3

Act, 18 U.S.C. § 1343 et seq. They also claim that the commissioners' actions deprived them of their civil rights in violation of 42 U.S.C. § 1983 ("Section 1983"). In their complaint, the plaintiffs set forth 61 specific counts of "Racketeering Activity," the earliest of which occurred on March 6, 2009, Pl. Compl. at * 10,[2] and the latest on March 7, 2015, id. at * 39. These counts detail the commissioners' alleged "extort[ion] [of] property and money from Plaintiffs in violation of [the Hobbs Act]," id. ¶ 26, as well as a small number of Wire Fraud allegations. It is further alleged that each of these counts describes "specific racketeering activity . . . prohibited by RICO." Id. ¶ 32. Finally, plaintiffs assert that "all actions that amount to RICO violations are also civil rights violations . . . that have the effect of denying the Plaintiffs of their civil rights under color of State law" and therefore also constitute violations of Section 1983. Id. ¶ 80.

The commissioners have moved to dismiss. They argue that plaintiffs' claims are barred by the relevant statutes of limitations. In the alternative, they invoke the statutory immunity provided by W. Va. Code § 55-7C-1.

---

[2] The "Racketeering Activity Counts" set forth in the complaint are interspaced among the complaint's numbered paragraphs, but are not assigned a paragraph number. Instead they are independently numbered.

4

As specified by federal statute, "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  Both RICO and Section 1983 expressly provide a cause of action for private citizens. Accordingly, the court is properly invested with jurisdiction.

<u>The Motion to Dismiss Standard</u>

Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff's complaint to contain "a short and plain statement of the claim showing . . . entitle[ment] to relief."  Fed. R. Civ. P. 8(a)(2); <u>Erickson v. Pardus</u>, 551 U.S. 89, 93 (2007).  Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted . . . ."  Fed. R. Civ. P. 12(b)(6).

The required "short and plain statement" must provide "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 545 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957), <u>overruled on other grounds</u>, <u>Twombly</u>, 550 U.S. at 563); <u>see also</u> <u>Anderson v. Sara Lee Corp.</u>, 508 F.3d 181, 188 (4th Cir. 2007). The showing of an "entitlement to relief" must amount to "more than labels and conclusions . . . ."  <u>Twombly</u>, 550 U.S. at 555.

"[A] formulaic recitation of the elements of a cause of action will not do."  Id.; Giarratano v. Johnson, 521 F.3d 298, 304 (4th Cir. 2008).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570); see also Monroe v. City of Charlottesville, 579 F.3d 380, 386 (4th Cir. 2009).

When evaluating the motion, a district court is required to "'accept as true all of the factual allegations contained in the complaint . . . .'"  Erickson, 551 U.S. at 94 (quoting Twombly, 550 U.S. at 555-556); see also South Carolina Dept. Of Health And Environmental Control v. Commerce and Industry Ins. Co., 372 F.3d 245, 255 (4th Cir. 2004) (quoting Franks v. Ross, 313 F.3d 184, 192 (4th Cir. 2002)).  Factual allegations are to be distinguished from legal conclusions, which the court need not accept as true.  Iqbal, 556 U.S. at 678 ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").  The court must also "draw[] all reasonable . . . inferences from th[e] facts in the plaintiff's favor . . . ." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).

<u>Discussion</u>

The court addresses the defendants' arguments for dismissal.

A. <u>Immunity under W. Va. Code § 55-7C-1</u>

First, defendants argue that W. Va. Code § 55-7C-1, et seq., grants them immunity from the claims in this lawsuit. Section 55-7C-3 states as follows:

> [A] qualified director shall not be held personally liable for negligence, either through act or omission, or whether actual or imputed, in the performance of managerial functions performed on behalf of a volunteer organization or entity: Provided, That this section shall not exempt a qualified director from liability when he or she is found to be grossly negligent in the performance of his or her duties.

Section 55-7C-2(3) defines a "qualified director" as "an individual who serves without compensation for personal services as an officer, member or director of a board, commission, committee, agency or other nonprofit organization which is a volunteer organization or entity."  A "volunteer organization or entity" includes "[t]he state or any political subdivision or subdivisions thereof."  W. Va. Code § 55-7C-2(4).  And "managerial function" is defined to include "the act or acts of a qualified director, whereby such qualified director, through direction, regulation or administration, exercises government

7

[sic], control, or superintendence of the affairs of a volunteer organization or entity."  W. Va. Code § 55-7C-2(1).

Defendants claim that the Commission, as an arm of the state, is a "volunteer organization or entity," that the commissioners are therefore "qualified directors," and that this lawsuit arises from conduct performed while fulfilling "managerial functions."

Defendants are not immune under W. Va. Code § 55-7C-3, however, because the statute provides immunity only from negligence.  Section 55-7C-3 states that directors "shall not be held personally liable for negligence," and the provision does not extend even to gross negligence.  W. Va. Code § 55-7C-3 ("[T]his section shall not exempt a qualified director from liability when he or she is found to be grossly negligent in the performance of his or her duties.").

The statute does not clarify whether "negligence" refers only to the tort of negligence, or to any liability from negligent conduct.  The court will review plaintiffs' claims to determine whether any may succeed upon proof of merely negligent conduct.

8

The complaint first alleges that defendants violated the RICO Act, which prohibits persons from "conduct[ing] or participat[ing] . . . in the conduct of [an] enterprise's affairs through a pattern of racketeering activity."  See 18 U.S.C. § 1962.  The statute defines "racketeering activity" as any one of a list of crimes, see 18 U.S.C. § 1961, and clarifies that a "pattern" of such activity "requires at least two acts of racketeering activity" within ten years of each other.  18 U.S.C. § 1961.  Courts often refer to the enumerated "racketeering activity" crimes as RICO "predicate acts."

One possible predicate act is a violation of the Hobbs Act, 18 U.S.C. § 1951, a statute that criminalizes "extortion," defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951.  To show that defendants engaged in a "pattern of racketeering activity," plaintiffs allege that defendants committed sixty violations of the Hobbs Act in "extort[ing] money and other things of value from Plaintiffs" by using "the power of their official offices."[3]  Pl. Compl. ¶ 16.

_____

[3] Plaintiffs include sixty-one "Racketeering Activity Counts," as well as one additional, non-numbered claim of racketeering activity in ¶¶ 33-45, for a total of sixty-two violations.  As discussed below, Count 56 alleges a violation of 18 U.S.C. §

To show that a defendant has violated the Hobbs Act by obtaining property under color of official right, the government in a criminal case must demonstrate that "a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." Evans v. United States, 504 U.S. 255, 268 (1992).  Thus, courts have described the core of a Hobbs Act violation as "a quid pro quo" between the official and a payor. United States v. Hairston, 46 F.3d 361, 365 (4th Cir. 1995); see also United States v. Ellis, 91 F.3d 135, at *5 (4th Cir. 1996) (unpublished)("In McCormick [v. United States, 500 U.S. 257 (1991),] . . . the Supreme Court held that a quid pro quo jury instruction is required under the Hobbs Act in cases where a person is alleged to have acted under the color of official right and received a 'campaign contribution' in return for the performance of, or abstaining from an official act. . . . Thereafter, in Evans, the Supreme Court extended the holding of McCormick to non-campaign contribution cases.").

In discussing the "quid pro quo" requirement, cases appear to require either knowledge that a payment was made in return for an official act, or intent that it be so made.  See

1343, the Wire Fraud statute, not of the Hobbs Act, and the violations described in ¶¶ 33-45 also allege a Wire Fraud violation.

10

Hairston, 46 F.3d at 365 (stating a requirement that an "official has obtained a payment . . . knowing that the payment was made . . . for official acts.")(emphasis added)(quoting Evans, 504 U.S. at 268); see also Hairston, 46 F.3d at 365 ("The requirement of a quid pro quo means that . . . a public official . . . intends the payor to believe that absent payment the official is likely to abuse his office . . . to the detriment . . . of the prospective payor or to give the prospective payor less favorable treatment.")(emphasis added)(quoting Evans, 504 U.S. at 274)(Kennedy, J., concurring).  The Fourth Circuit's recent opinion in United States v. McDonnell, which reviewed non-Hobbs-Act cases to inform its understanding of the quid pro quo requirement, appears to have held that intent is required. 792 F.3d 478, 514 (4th Cir. 2015), cert. granted 136 S.Ct. 891 (2016)("[T]he term 'quid pro quo' refers to 'an intent on the part of the public official to perform acts on his payor's behalf.'")(quoting United States v. Jefferson, 674 F.3d 332, 358 (4th Cir. 2012)); McDonnell, 792 F.3d at 518 ("Next we turn to whether the Government presented evidence sufficient to support a conclusion that there was a corrupt quid pro quo, 'a specific intent to give or receive something of value in exchange for an official act.'")(quoting United States v. Sun-Diamond Growers of California, 526 U.S. 398, 404-05 (1999)); but see McDonnell, 792 F.3d at 514 (approving of defendant's Hobbs Act jury instruction

11

stating that defendant "must have 'obtained a thing of value to which he was not entitled, knowing that the thing of value was given in return for official action.'").

Because a Hobbs Act violation requires acceptance of a payment with knowledge that it has been made in return for an official act, or intent that it be so made, negligent conduct obviously cannot ground a conviction under the statute.  <u>See</u>, <u>e.g.</u>, <u>Negligence</u>, Black's Law Dictionary (10th ed. 2014)(defining "negligence," in part, as "[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation"); General Requirements of Culpability, Model Penal Code § 2.02 (stating that negligence requires only that a person "should be aware of a substantial and unjustifiable risk").  An official who accepts a payment with either knowledge or intent that the payor believes an official act has been purchased goes beyond merely failing to exercise due care.  The commissioners are thus not immune from any RICO claims stemming from Hobbs Act violations.

The complaint also includes an additional, non-numbered count, <u>see</u> Pl. Compl. ¶ 45, as well as Racketeering Count 56, which both allege violations of the Federal Wire Fraud Act, 18 U.S.C. § 1343, 1346.  These violations would trigger

12

recovery under the RICO statute in the same manner as the Hobbs

Act.  The Wire Fraud Statute states that

> Whoever, having devised or intending to devise any
> scheme or artifice to defraud, or for obtaining money
> or property by means of false or fraudulent pretenses,
> representations, or promises, transmits or causes to
> be transmitted by means of wire, radio, or television
> communication in interstate or foreign commerce, any
> writings, signs, signals, pictures, or sounds for the
> purpose of executing such scheme or artifice, shall be
> fined under this title or imprisoned not more than 20
> years, or both.

18 U.S.C. § 1343.  "To establish a scheme to defraud, 'the

government must prove that the defendant[ ] acted with the

specific intent to defraud.'"  U.S. v. Wynn, 684 F.3d 473, 478

(4th Cir. 2012)(quoting United States v. Godwin, 272 F.3d 659,

666 (4th Cir. 2001))(emphasis in original); see also United

States v. Stalnaker, 571 F.3d 428, 436 (5th Cir. 2009)("Wire

fraud is a specific-intent crime requiring proof that the

defendant knew the scheme involved false representations, which

related to material information.")(internal quotation marks and

citations omitted).  Because at least one element of Wire Fraud

requires proof of specific intent, defendants cannot commit it

through negligence alone.  Thus, the commissioners are not

immune from any RICO claims based on these violations.

Plaintiffs also allege violations of 42 U.S.C. § 1983.

The court notes that plaintiffs are not completely clear as to

13

the constitutional or statutory provision(s) that ground their §
1983 claims, but defendants have failed to raise any questions
about the claims on that basis.  The complaint states the
following as to the § 1983 claims:

> 80. All actions that amount to RICO violations are
> also civil rights violations in that they have the
> effect of denying the Plaintiffs of their civil rights
> under color of State law pursuant to 42 U.S.C. § 1983.
>
> 81. The various specific acts of harassment such as
> destroying or attempting to destroy Plaintiffs'
> business, deliberately sabotaging the Williamson
> television presentation, and making it virtually
> impossible for Plaintiffs to engage in their legal
> business of promoting MMA events all similarly
> constitute the denial of Plaintiff's civil rights
> under color of State law pursuant to 42 U.S.C. §1983.

Pl. Compl. ¶ 80-81.  The claims appear to focus on RICO
violations themselves, as well as the Hobbs Act and Wire Fraud
Act violations supporting the RICO claims.  The complaint's
language may also suggest that plaintiffs suffered
constitutional violations, the more usual origin of § 1983
claims.

     To the extent that the § 1983 violations are based on
the RICO claim, they must be proven based on the violations
giving rise to that claim - a pattern of Hobbs Act or Wire Fraud
violations.  Thus, the commissioners have no immunity from any §
1983 claim based on violations of the RICO statute.  Similarly,

to the extent that the § 1983 claims are based directly on the violations underlying the RICO claim, rather than the RICO claim itself, those violations also plainly require conduct more culpable than negligence, as previously discussed.

If the § 1983 claims refer to constitutional violations, the most likely provision to be implicated would be the Due Process Clause of the Fourteenth Amendment.  Pl. Compl. ¶ 81 (noting "acts of harassment such as destroying or attempting to destroy Plaintiffs' business . . . and making it virtually impossible for Plaintiffs to engage in their legal business").  Because "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property," Jean v. Collins, 221 F.3d 656, 660 (4th Cir. 2000)(Wilkinson, J., concurring)(quoting Daniels v. Williams, 474 U.S. 327, 328 (1986)), plaintiffs could not succeed on such a claim based on a finding of negligence alone.

Defendants counter that they "attempted to follow the intent of West Virginia law to secure individuals to officiate . . . and to compensate those individuals at market rates to further that purpose."  Def. Repl. at *9.  Thus, in defendants' view, the complaint "amounts to a claim of negligent performance of official duties . . . ."  Id.

Defendants' statement that they acted in good faith, however, does not convert plaintiffs' causes of action into negligence claims.  Cf. Weigle v. Pifer, No. 2:14-CV-15087, 2015 WL 5972433, at *14 (S.D.W. Va. Oct. 14, 2015)("[A] mere allegation of negligence does not turn an intentional tort into negligent conduct.")(quoting Benavidez v. United States, 177 F.3d 927, 931 (10th Cir.1999)).

The court thus rejects defendants' claim of immunity under state law.

## B. Statutes of Limitations

Defendants also argue that plaintiffs' claims under both RICO and Section 1983 are time-barred.

### 1.  RICO Claims

"The statute of limitations on private civil RICO claims is four years, beginning on the date the plaintiff 'discovered, or should have discovered, the injury.'"  CVLR Performance Horses, Inc. v. Wynne, 792 F.3d 469, 476 (4th Cir. 2015) cert. denied sub nom. Marsh v. Wynne, 136 S. Ct. 693 (2015) and cert. denied sub nom. Foster v. Wynne, 136 S. Ct. 693 (2015)(quoting Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc., 262 F.3d 260, 266 (4th Cir.2001)).  See also Potomac Elec.

Power, 262 F.3d at 266 ("Since PEPCO filed its complaint on July 29, 1998, the application of the statute of limitations essentially turns on the question of whether, with respect to each alleged injury, PEPCO knew or should have known of its injury prior to July 29, 1994.").

This case was brought on March 14, 2015,[4] and plaintiffs have alleged sixty-two RICO violations, see supra note 3, beginning on March 6, 2009 and continuing until March 7, 2015. Under the rule stated in Wynne and Potomac Elec. Power, plaintiffs may not recover for any injuries that they "discovered, or should have discovered," before March 14, 2011. Plaintiffs allege that the defendants made direct, clear demands of money or property, and plaintiffs do not suggest that they

---

[4] Although the complaint was filed in this court on May 11, 2015, plaintiffs gave the state notice of the lawsuit pursuant to W. Va. Code § 55-17-3 on March 14, 2015, see Pl. Compl. ¶ 14. The statute dictates that "any applicable statute of limitations is tolled for thirty days from the date the notice is provided and, if received by the government agency as evidenced by the return receipt of the certified mail, for thirty days from the date of the returned receipt." § 55-17-3(a)(2). Although plaintiffs have not presented any argument regarding the state statute, or any direct evidence of the date of a return receipt, defendants appear to agree, in their briefing of this motion, that March 14 is the relevant date for determining which claims are timely. See Def. Mem. in Supp. of Mot. to Dismiss at *2 ("Plaintiffs filed this instant action on March 14, 2015."), *10 ("Plaintiffs' applicable statutes of limitations began to run on March 6-7, 2009 and Plaintiffs did not file this action until March 14, 2015, more than six years later."). The court thus accepts, for purposes of this motion, that the lawsuit was filed on March 14, 2015.

were ignorant of any of the violations.  Thus, each violation

was "discovered" at the time it was committed.  Consequently,

plaintiffs' racketeering counts 1-19, which cover the period up

to January 15, 2011, are time-barred.  Count 20, which took

place on February 3-4 of 2012, as well as all following

allegations, remain operative.

        Both parties argue that the limitations rule should

not apply in this straightforward way.  Plaintiffs contend that

"[t]he entire history of the violations has been pled to show

that this is an intentional, 'continuing tort' that began in

2009 and continued through 2015."  Pl. Resp. to Def. Mot. to

Dismiss at *3.  They argue that West Virginia state law holds

"that when there is a 'continuing tort,' the statute of

limitations begins to run only when the most recent activity

occurs."  Id.

        As the defense points out, the United States Supreme

Court has explicitly considered plaintiffs' argument.  In Klehr

v. A.O. Smith Corp., the Court reviewed a rule developed by the

Third Circuit, which stated that if, "as a part of the same

pattern of racketeering activity, there is further injury to the

plaintiff or further predicate acts occur, [...] the accrual

period shall run from the time when the plaintiff knew or should

have known of the last injury or the last predicate act which is

18

part of the same pattern of racketeering activity." 521 U.S.
179, 186 (1997)(quoting Keystone Ins. Co. v. Houghton, 863 F.2d
1125, 1130 (3d Cir. 1988)). The "last predicate act" rule
allowed a plaintiff to sue based on every action within a
racketeering pattern so long as one of the actions fell within
the last four years. See Klehr, 521 U.S. at 186-87 ("[W]e
assume . . . that this rule means that as long as [the
defendants] committed one predicate act within the limitations
period (i.e., the four years preceding suit), the [plaintiffs]
can recover, not just for any added harm caused them by that
late-committed act, but for all the harm caused them by all the
acts that make up the total 'pattern.'"). The "last predicate
act" theory, in short, is precisely the rule proposed by
plaintiffs. See Pl. Resp. to Def. Mot. to Dismiss at *3 ("[T]he
statute of limitations begins to run only when the most recent
activity occurs.").

        The Supreme Court held in Klehr, however, that the
Third Circuit's "last predicate act" rule "is not a proper
interpretation of the law." Id. at 187. The Court noted, in
particular, that "a series of predicate acts (including acts
occurring at up to 10-year intervals) can continue
indefinitely," and so the rule, "in principle, lengthens the
limitations period dramatically. It thereby conflicts with a

basic objective — repose — that underlies limitations periods."
Id. Plaintiffs' proposed rule, which is essentially the "last
predicate rule" rejected in Klehr, thus fails.

Defendants contend, on the other hand, that all of
plaintiffs' RICO injuries, even those within the last four
years, are time-barred because the pattern of activity began
more than four years ago. See Def. Mem. in Supp. of Mot. to
Dismiss at *8 ("[Because] Plaintiffs' [actions] accrued starting
in March of 2009, the applicable statutes of limitations in all
of Plaintiffs' claims expired more than two years prior to the
filing of Plaintiffs' . . . Complaint. For this, and the reasons
stated above, Plaintiffs claims must be dismissed as time
barred."). Defendants do not, however, cite any doctrine
supporting this theory, and a great deal of authority directly
contradicts it. See, e.g., Lehman v. Lucom, 727 F.3d 1326, 1331
(11th Cir. 2013)("[I]f a new RICO predicate act gives rise to a
new and independent injury, the statute of limitations clock
will start over for the damages caused by the new act."); 
Grimmett v. Brown, 75 F.3d 506, 512 (9th Cir. 1996)("[A] cause
of action accrues when new overt acts occur within the
limitations period, even if a conspiracy was formed and other
acts were committed outside the limitations period."); Klehr,
521 U.S. at 190 ("[S]ome Circuits have adopted a 'separate

20

accrual' rule in civil RICO cases, under which the commission of a separable, new predicate act within a 4-year limitations period permits a plaintiff to recover for the additional damages caused by that act. . . . Thus, the Klehrs may point to new predicate acts that took place after [the date four years before the start of their lawsuit] . . . ."); cf. In re Cotton Yarn Antitrust Litig., 505 F.3d 274, 290-91 (4th Cir. 2007)("Thus, in cases like this one involving allegations of 'a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff, e.g., each sale to the plaintiff, starts the statutory period running again.'")(quoting Klehr, 521 U.S. at 189).[5]

_____

[5] These "separate accrual" doctrines are similar to the distinctive version of the "continuing violation" doctrine that the Fourth Circuit has applied outside the RICO context. "In general," under Fourth Circuit rules, "'[t]o establish a continuing violation [...] the plaintiff must establish that the unconstitutional or illegal act was a [...] fixed and continuing practice.'" Nat'l Advert. Co. v. City of Raleigh, 947 F.2d 1158, 1166 (4th Cir. 1991)(quoting Perez v. Laredo Junior College, 706 F.2d 731, 733 (5th Cir. 1983)). "The challenged action must [also] be repeated within the statute of limitations period." Nat'l Advert. Co., 947 F.2d at 1167. "If . . . the statutory violation does not occur at a single moment but in a series of separate acts and if the same alleged violation was committed at the time of each act, then the limitations period begins anew with each violation and only those violations preceding the filing of the complaint by the full limitations period are foreclosed." Id.
        The Fourth Circuit's doctrine suggests that, because plaintiffs' claim is based on separate violations, each one

If defendants' contrary analysis were accepted, a racketeering operation could violate the law repeatedly and indefinitely, immune from civil liability, if the victims failed to sue within the first four years of its operation. Defendants' theory has no basis in any relevant legal materials, and the court thus rejects it.

The court concludes that plaintiffs' racketeering counts 1-19 are time-barred, but that their RICO claim remains viable on the basis of the other predicate acts described in the complaint.

2.   <u>Section 1983 Claims</u>

Section 1983 claims are subject to the limitations period applied by the forum state to personal injury actions. <u>Wilson v. Garcia</u>, 471 U.S. 261, 280 (1985); <u>see</u> <u>also</u> <u>Owens v. Okure</u>, 488 U.S. 235 (1989)(holding that "where a state has one or more statutes of limitations for certain enumerated intentional torts, and a residual statute for all other personal injury actions . . . the residual or general personal injury statute . . . applies" to Section 1983 claims).  In West

_____

accrued separately rather than all of the claims accruing at the time that the first injury occurred.  <u>Id.</u>  Again, this view is consistent with the rules cited above.

Virginia, Section 1983 claims are subject to the two-year period set forth in W. Va. Code § 55-2-12.  See e.g., Sattler v. Johnson, 857 F.2d 224, 226-27 (4th Cir. 1988); Bell ex rel. Bell v. Bd. of Educ. of County of Fayette, 290 F. Supp. 2d 701 (S.D.W.Va. 2003).

"[E]ven though the limitation period is borrowed from state law, the question of when a cause of action accrues under 42 U.S.C. § 1983 remains one of federal law." Nasim v. Warden, Maryland House of Correction, 64 F.3d 951, 955 (4th Cir. 1995)(en banc)(emphasis in original)(citing Cox v. Stanton, 529 F.2d 47, 50 (4th Cir. 1975)).  "[T]o determine the date of accrual for a particular § 1983 claim, a court must look to the common-law tort that is most analogous to the plaintiff's § 1983 claim and determine the date on which the limitations period for this most analogous tort claim would begin to run." Owens v. Baltimore City State's Attorneys Office, 767 F.3d 379, 389 (4th Cir. 2014)(quoting Wallace v. Kato, 549 U.S. 384, 388 (2007)), cert. denied sub nom. Baltimore City Police Dep't v. Owens, 135 S. Ct. 1893 (2015).  Based on the accrual of typical common-law tort claims, "'it is the standard rule that accrual [for § 1983 claims] occurs when the plaintiff has a complete and present cause of action' against a defendant — that is, when the plaintiff knows or has reason to know of his injury." Owens,

767 F.3d at 389 (quoting Wallace v. Kato, 549 U.S. 384, 388 (2007)).  But the "standard rule" admits of a few exceptions. For example, a section 1983 claim for a wrongful conviction does not accrue until the conviction is invalidated, because claims for malicious prosecution, which are "the closest analogy" in tort law, do not accrue until "termination of the prior criminal proceeding in favor of the accused."  Heck v. Humphrey, 512 U.S. 477, 486 (1994).  Similarly, because they are analogous to the tort of false imprisonment, section 1983 claims for wrongful arrest do not accrue until the individual is released or his detention becomes lawful.  Wallace, 549 U.S. at 389-92 (holding that "false imprisonment consists of detention without legal process, [and] a false imprisonment ends once the victim becomes held pursuant to such process," and that false imprisonment claim brought by unlawfully arrested plaintiff accrued "when [plaintiff] appeared before the examining magistrate and was bound over for trial," because his detention then became legal)(emphasis in original).

        The rule requiring courts to "look to the common-law tort that is most analogous to the plaintiff's § 1983 claim" originated somewhat recently.  See Heck v. Humphrey, 512 U.S. 477; Wallace v. Kato, 549 U.S. 384.  Traditionally, all § 1983

claims were said to accrue "when the plaintiff knows or has
reason to know of his injury."

It is unclear whether the newer doctrine announced in
Heck and Wallace, requiring courts to look for tort-law
analogues of a plaintiff's claims, governs § 1983 claims based
on violations of federal statutes rather than the Constitution.
Heck and Wallace devised an accrual point for constitutional
claims that have no natural accrual time, and did so by looking
to other laws with well-settled accrual rules.  But in cases
where a statutory violation grounds the § 1983 claim, the
statute, or accompanying judicial decisions, may well give a
clear answer to when the claim accrues, and the resort to tort
law may be unnecessary.  The Supreme Court suggested, however,
that Heck and Wallace flowed from deep connections between §
1983 and tort law.  See Heck, 512 U.S. at 483 ("We have
repeatedly noted that 42 U.S.C. § 1983 creates a species of tort
liability.  Over the centuries the common law of torts has
developed a set of rules to implement the principle that a
person should be compensated fairly for injuries caused by the
violation of his legal rights.  These rules, defining the
elements of damages and the prerequisites for their recovery,
provide the appropriate starting point for the inquiry under §
1983 as well.  Thus, to determine whether there is any bar to

the present suit, we look first to the common law of torts.")(internal citations and quotations omitted).  Reference to tort rules may thus be required even where an underlying federal statute provides a clear accrual rule that could be transferred to a § 1983 claim based on a violation of that statute.

To apply the most-analogous-tort rule, the court must review plaintiffs' claims.  The court described, above, plaintiffs' § 1983 claims, as well as the uncertainty about their exact statutory or constitutional bases at this time.  See Pl. Compl. ¶ 80-81 (stating that plaintiffs' civil rights were violated by "[a]ll actions that amount to RICO violations" as well as "specific acts of harassment such as destroying or attempting to destroy Plaintiffs' business, deliberately sabotaging the Williamson television presentation, and making it virtually impossible for Plaintiffs to engage in their legal business").  The complaint suggests that the § 1983 violations flow from the RICO claim, the predicate acts underlying the RICO claim, and possible constitutional claims, such as deprivations of property in violation of the Fourteenth Amendment.  All of the violations relate, however, to the officials' wrongful demands for plaintiffs' money and assets, including requiring cash payments and free tickets, and interference with

plaintiffs' rights to their businesses and property.  As
described above, the acts arose from defendants' abuse of their
government office.

These allegations of thievery and interference with
business assets are most similar to the common-law tort of
conversion.  <u>See</u> Restatement (Second) of Torts § 222A
(1965)("Conversion is an intentional <u>exercise of dominion or
control over a chattel</u> which so seriously <u>interferes with the
right of another to control it</u> that the actor may justly be
required to pay the other the full value of the
chattel.")(emphasis added).  In particular, the scenarios
described by plaintiffs appear analogous to conversion
accomplished by fraud or duress.  Restatement (Second) of Torts
§ 252A (1965)("Consent to possession of a chattel obtained by
fraud or duress is not effective to prevent recovery for
trespass to the chattel or for conversion against any one other
than a bona fide purchaser of the chattel.").

In this case, it is alleged that the officials
intentionally took money and other property, including tickets
and intangible rights to seating, from plaintiffs, thus
"intentional[ly]" "exercis[ing] . . . dominion or control over
[plaintiffs'] chattel[s]."  Restatement (Second) of Torts §
222A.  They did not give the property back at any time, and thus

27

"so seriously interfere[d] with the right of [plaintiffs] to control it that the [defendants] may justly be required to pay the other the full value."  Id.  Moreover, the officials made their demands based on a claim that they had the right to do so, and threatened to destroy plaintiffs' business if they did not comply, see Pl. Compl. ¶ 16, thus "obtain[ing] by fraud or duress" any "[c]onsent" they received "to possession of [the] chattel[s]."  Restatement (Second) of Torts § 252A.  Although some courts have held that the tort of conversion does not apply to claims for general stolen funds that are not specifically identifiable, see, e.g., Shahood v. Cavin, 154 Cal. App. 2d 745, 747 (1957), conversion is nevertheless the tort "most analogous to" the claims in this case.

Traditionally, an action for conversion accrued at the time of the conversion.  54 C.J.S. Limitations of Actions § 254 (2016)("A cause of action for conversion ordinarily accrues at, and the statute of limitations begin[s] to run from, the date of the conversion, and according to some authority, this is the rule even if the true owner is unaware that the chattel is missing. . . . Moreover, the running of the limitations will not be tolled because of fraudulent concealment where the plaintiff was on notice or reasonably should have been on notice of the alleged conversion."); 18 Am. Jur. 2d Conversion § 105

28

(2016)("Where an action is founded on a wrongful conversion of goods, the statute of limitations generally begins to run from the time of the conversion even if the conversion is not discovered by the plaintiff until later.").  Recent cases, on the other hand, appear to hold that the cause of action accrues when the injury is discovered.  <u>See</u> Dan B. Dobbs, Paul T. Hayden and Ellen M. Bublick, The Law of Torts § 74 (2d ed.)("In the case of conversion of ordinary chattels, the older rule starts the statute of limitations running at the time of conversion, not at the time the conversion was or should have been discovered.  However, a number of contemporary cases, sometimes under the impetus of a statute, have supported the discovery rule, holding that the cause of action accrues only when the owner discovered or should have discovered the conversion.").

In the present action, these two rules lead to the same result.  Plaintiffs do not suggest that they were ignorant of the commissioners' demands.  They discovered the injuries when they occurred, and so, under either rule, the cause of action accrued at the time of the injuries.  The conclusion would have been the same under the rule operative before <u>Heck</u> and <u>Wallace</u>, which asked "when the plaintiff knows or has reason to know of his injury."  It also aligns with the rule for RICO claim accrual, which is discussed above.  Thus, even if there is

29

a question of whether the Heck and Wallace decisions apply to limitations on § 1983 claims that are based on statutory rather than constitutional violations, the question is academic in this case.

The inquiry does not end there, however.  With respect to the § 1983 claims, the court must once again consider plaintiffs' argument that the entire set of violations was part of a "continuing violation" under West Virginia's rules for limitations on actions, and that this rule saves their claims from otherwise applicable time bars.  Such an argument may have greater purchase for § 1983 claims than it does in the RICO setting, as no case forecloses a § 1983 plaintiff from relying on the continuing violation theory.[6]

Under West Virginia law, "continuing misconduct . . . serves to toll the statute of limitations under the continuing tort doctrine."  Roberts v. W. Virginia Am. Water Co., 221 W. Va. 373, 378 (2007).  "Where a tort involves a continuing or

---

[6] Whether a § 1983 plaintiff may take advantage of West Virginia's "continuing violation" doctrine depends on whether it is an accrual rule or a tolling rule.  The distinction matters because accrual rules are drawn from federal law, while tolling rules are drawn from state law.  See Wallace, 549 U.S. at 394 (noting that federal courts "have generally referred to state law for tolling rules, just as we have for the length of statutes of limitations").  Because the court concludes that plaintiffs may not benefit from the West Virginia tolling doctrine, however, there is no need to address this question.

repeated injury, the cause of action accrues at and the statute of limitations begins to run from the date of the last injury or when the tortious overt acts or omissions cease." Roberts v. W. Virginia Am. Water Co., 221 W. Va. at 378 (quoting Graham v. Beverage, 211 W.Va. 466 (2002)); see also EQT Gathering Equity, LLC v. Fountain Place, LLC, No. 2:09-0069, 2011 WL 5419452, at *3 (S.D.W. Va. Nov. 9, 2011)(discussing contours of doctrine). Under this rule, a plaintiff may sue for an entire series of continuing tort violations, so long as the last violation falls within the limitation period. Roberts, 221 W. Va. at 375. Such was the case in Graham v. Beverage, where defendant developers installed a defective storm water drainage system, and then continued, over time, to act negligently by failing to repair it. 211 W.Va. at 476-77. The court did "not find the negligence claim time-barred because the alleged negligence of the [developers] complained of by the [plaintiffs] constitutes continuing wrongful conduct from which continuing injuries emanate." Id. at 477.

West Virginia law has grappled with situations comparable to the one at present, where a plaintiff alleges that a multitude of illegal acts occurred over a period of time. In Copier Word Processing Supply, Inc. v. WesBanco Bank, Inc., the Supreme Court of Appeals of West Virginia considered whether a

31

bank's acceptance of hundreds of deposits from a secretary
repeatedly embezzling from her employer constituted a continuing
tort.  220 W. Va. 39, 40-42 (2006).  Largely on the authority of
DeRocchis v. Matlack, Inc., 194 W.Va. 417 (1995), the court in
Copier Word stated that "a 'continuing cause of action' is found
in 'a situation where events, which for all practical purposes
are identical, occur repeatedly, at short intervals, in a
consistent, connected, rhythmic manner,' and that 'similar, but
separate' injuries each give rise to a separate and distinct
cause of action."  Copier Word, 220 W. Va. at 45 (quoting
DeRocchis, 194 W.Va. at 423 n. 4).  The court thus found that
the bank's repeated acts – alleged as repeated torts of
conversion – "were carried out repeatedly over time, [but] each
conversion was a discrete act, a single transaction involving a
specifically individual negotiable instrument."  Copier Word,
220 W. Va. at 46.

        The Copier Word court drew a contrast between the
bank's individual, separate acts, which were not a continuing
violation, and "instances where a wrongful act was sustained
over time, causing continuing damages."  Id. at 44.  The court
looked, in particular, to the cases of Graham v. Beverage, 211
W.Va. at 476, and Handley v. Town of Shinnston, 169 W.Va. 617
(1982), both of which involved defectively-installed water

32

equipment that defendants negligently failed to repair over a long period of time.  In both Graham and Handley, the defendants' actions essentially consisted of an ongoing act that created continuing damages.  Copier Word, 220 W. Va. at 44 (noting that the cases involved "a wrongful act [that] was sustained over time")(emphasis added).  This feature of the cases — of a single, continuing act as opposed to multiple, separate acts — formed the basis for the explanation as to when the continuing violation doctrine would be permitted.

        West Virginia's Supreme Court of Appeals has come to similar conclusions in other cases involving discrete injuries rather than an ongoing act.  See, e.g., Smith v. Raven Hocking Coal Corp., 199 W. Va. 620 (1997)(coal mining company's pattern of blasting near farmer's land should be viewed as a set of separate acts, not as a single continuing violation); Auber v. Jellen, 196 W. Va. 168 (1996)(doctor's series of incorrect diagnoses of a patient were separate acts, rather than a single continuing violation); DeRocchis, 194 W.Va. 417, 423 n.4 (noting that worker's exposures to chemical fumes were "sporadic and nonconsistent," and thus "separate causes of action" rather than a continuing violation).  The court has confronted at least one case presenting a close call between separate, individual acts and a single continuing act made up of "events, which for all

33

practical purposes are identical, occur repeatedly, at short intervals, in a consistent, connected, rhythmic manner." See Taylor v. Culloden Public Service Dist., 214 W. Va. 639 (2003)(holding that repeated discharges of waste water from treatment facility over time constituted continuing tort); see also Copier Word 220 W. Va. at 44, n.7 (discussing waste water discharges in Taylor as "a continuing act").  And perhaps because of some difficulties in applying the rule neatly, decisions of whether to use the doctrine have not always been free of criticism.  See Copier Word 220 W. Va. at 49-50 (Starcher, J. dissenting); id. at 50 (Albright, J., dissenting).

     In light of Copier Word and similar opinions such as Auber and Raven Hocking Coal, however, the case at bar, which alleges separate, repeated acts, rather than a single, continuing act, may not benefit from the continuing injury doctrine.  See W.W. McDonald Land Co. v. EQT Prod. Co., 983 F. Supp. 2d 790, 811 (S.D.W. Va. 2013), opinion clarified (Jan. 21, 2014)("The continuing tort theory will not apply to toll the statute of limitations, even though the plaintiff brings tort actions, where the injuries were multiple and periodic, not continuing.")(citing Copier Word, 220 W.Va. 39).  Plaintiffs plainly allege specific, individual instances, all similar but slightly different from one another, in which defendants took

their property or otherwise interfered with the running of their business.  For example, some of plaintiffs' counts allege extortion of money — though in different amounts, <u>see</u>, <u>e.g.</u>, Pl. Compl. at *36 (officials charging four times permissible amount); *38 (officials charging twice the permissible amount) — and others allege demands for different types of property, <u>see</u>, <u>e.g.</u>, Pl. Compl. at *26 (alleging demand of VIP passes).  The demands were made by different persons, and there were also time periods of months or years between some of the demands.  <u>See</u>, <u>e.g.</u>, Pl. Compl. at *16 (no actions alleged between January 2011 and February 2012).  The events were not, in short, "events, which for all practical purposes are identical, occur[ring] repeatedly, at short intervals, in a consistent, connected, rhythmic manner."  Although the alleged actions in this case formed an ongoing pattern, that was also true in <u>Copier Word</u>, where the secretary embezzled money pursuant to a clear pattern over time.  <u>Copier Word</u>, 220 W.Va. at 41 ("Copier alleges that, over the years, Ms. Hendrickson repeated this process at least 721 times, embezzling approximately $472,000.00 . . . .").  The fact that defendants' individual acts were part of a pattern or scheme does not make them a single, continuing act rather than "similar, but separate" acts.  <u>Copier Word</u>, 220 W. Va. at 45.

It is true that this case differs from <u>Copier Word</u> in that the RICO statute allows plaintiffs to sue based on an entire "pattern of racketeering activity" using one legal claim. This quirk of the RICO law, however, does not change the underlying nature of West Virginia's continuing violation doctrine. The court in <u>Copier Word</u> focused heavily on the character of the defendants' acts themselves, rather than whether they could be brought as one or many legal claims. <u>See Copier Word</u> 220 W. Va. at 45 (stating that "a 'continuing cause of action' is found in a situation where <u>events</u> . . . occur repeatedly . . . and . . . that 'similar, but separate' <u>injuries</u> each give rise to a separate and distinct cause of action."); 46 ("each conversion was a <u>discrete act</u>"); 44 (noting that doctrine applies in "instances where <u>a wrongful act</u> was sustained over time, causing continuing damages")(emphasis added to all quotations). The contrary rule would grant the plaintiff's choice of legal theory a significance most undeserved. For example, if the Copier Word plaintiff had brought suit alleging a conspiracy to commit all of the conversions, rather than for the conversions themselves, the entire set of acts could then form the basis for one legal claim. To hold that conversions may not use the tolling doctrine, but that conspiracy to commit the same set of conversions may take advantage of it, would elevate form over substance. The same logic applies to the use

36

of the doctrine with a RICO claim rather than a set of individual statutory violations.

The same observation applies to plaintiffs' argument that an allegation of Wire Fraud should allow them to take advantage of West Virginia's continuing violation doctrine. Plaintiffs' response to defendants' motion drew particular attention to one of the RICO predicate acts mentioned in the complaint — the wire fraud alleged in Count 56:

> Joanna Hardwick in connivance with the Defendants, having devised a scheme or artifice to defraud, in violation of 18 U.S.C. §§ 1343, obtained ten (10) Rough N' Rowdy ringside VIP/Guest Passes by means of false or fraudulent pretenses and representations transmitted by interstate wire, to wit: a representation that such tickets were required to be provided to the West Virginia Athletic Commission officials. Said demand was transmitted and or caused to be transmitted by means of emails to Christopher M. Smith, for the purpose of executing said scheme.

Pl. Compl. at *32-33. Again, despite plaintiffs' suggestion that this incident formed part of a larger plan or scheme to defraud, the complaint alleges an individual act of extortion in which ten tickets were procured.  It is thus similar to one of the many conversions in the Copier Word scheme.  As stated above, such a pattern does not implicate the continuing violation doctrine.

Plaintiffs thus may not take advantage of the continuing violations doctrine to toll the two-year statute of limitations.  Because this case was filed on March 14, 2015, plaintiffs may recover under § 1983 only for injuries suffered on or after March 14, 2013.  This appears to exclude plaintiffs' racketeering counts 1-36, while leaving intact counts 37-61, along with any other miscellaneous, non-numbered events occurring during the relevant time period, including the events described in ¶¶ 39-45 of the complaint.

## Conclusion

For the foregoing reasons, the court ORDERS that defendants' motion to dismiss should be, and it hereby is, granted, with respect to the following:

- Plaintiffs' RICO claims based on acts committed before March 14, 2011, including plaintiffs' racketeering counts numbered 1-19; and

- Plaintiffs' § 1983 claims based on acts committed before March 14, 2013, including plaintiffs' racketeering counts numbered 1-36.

In all other respects, the court ORDERS that defendants' motion to dismiss should be, and it hereby is, denied.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: March 31, 2016

John T. Copenhaver, Jr.
United States District Judge

39