UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

CHRISTOPHER MACCORKLE SMITH,
and A.C.R. PROMOTIONS, INC.,
d/b/a Rough N' Rowdy Brawl
d/b/a Ruckus in the Cage,

          Plaintiffs,

v.                                   Civil Action No. 2:15-cv-06026

STEVEN A. ALLRED, individually
and in his official capacity,
DOUGLAS E. PAULEY, individually
and in his official capacity,
and BRIAN SIMPSON, individually
and in his official capacity,

          Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

        Pending are defendants' motion to reconsider the

court's order as to the motion to dismiss, filed April 11, 2016,

and defendants' motion for summary judgment and partial summary

judgment, filed March 4, 2016.


<u>Background</u>


        This action arises from allegations that West Virginia

regulators engaged in corrupt conduct that harmed a boxing

promoter's business.  Plaintiff A.C.R. Promotions, Inc.,

("A.C.R.") is a West Virginia corporation engaged in the

business of hosting and promoting professional, semi-

professional, and amateur combat sports events, including both boxing and mixed martial arts matches.  A.C.R. promotes events in West Virginia, as well as in Virginia, North Carolina, Tennessee, Georgia, Alabama, and Kentucky.  Plaintiff Christopher MacCorkle Smith ("Smith") is the president and owner of A.C.R.

A.C.R.'s events in West Virginia are subject to regulation and oversight by the West Virginia State Athletic Commission ("the Commission"), members and former members of which appear as defendants in this action.  Plaintiffs contend that, over a number of years, the Commission took various corrupt and unlawful actions, including charging fees greater than those allowed by statute, hiring more officials (who must be paid by fight promoters) than necessary, demanding special tickets or access for family members and other associates, and unethically assigning themselves as judges and referees in prominent matches.  Plaintiffs also contend, as will be discussed further below, that the Commission maliciously interfered with plaintiffs' attempt to create a reality television show based on public demonstrations and the persons who fight in them.

Plaintiffs filed the complaint in this action on May 11, 2015, alleging violations of the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., through a pattern of violations of the Hobbs Act, 18 U.S.C. § 1951 et seq., and the Federal Wire Fraud Act, 18 U.S.C. § 1343 et seq.  They also claim that the commissioners' actions deprived them of their civil rights in violation of 42 U.S.C. § 1983 ("Section 1983").

In an order entered March 31, 2016, this court ruled that plaintiffs' RICO claims are subject to a four-year statute of limitations, and that the Section 1983 claims are subject to a two-year statute of limitations.  Smith v. Allred, No. 2:15-cv-06026, 2016 WL 1274593, *6-14 (S.D.W. Va. Mar. 31, 2016).  In calculating the effect of the statute of limitations, plaintiffs considered their suit to have been filed on the date on which they gave statutory notice of the lawsuit to state officials, which was March 14, 2015, almost two months before the complaint was filed on May 11.  Because defendants not only did not object to this calculation, id. at *6 n.4, but used that same date in briefing their motion to dismiss, the court used it as well in dismissing "Plaintiffs' RICO claims based on acts committed before March 14, 2011" and "Plaintiffs' § 1983 claims based on acts committed before March 14, 2013," id. at *14.  The opinion also stated that defendants are not immune from plaintiffs' claims based on W. Va. Code § 55-7C-1.  Id. at *5-6.

3

In their motion to reconsider the court's order as to the motion to dismiss, defendants contend that (1) plaintiffs' RICO claims are time-barred, and (2) the court should treat the date that plaintiffs filed their complaint – not the date that they gave statutory notice to state officials - as the date the lawsuit was filed.  Inasmuch as the defendants failed to raise the latter issue in their motion to dismiss, the motion to reconsider is, as to that issue, denied.

In their motion for summary judgment and partial summary judgment, defendants repeat two of their arguments that the court discussed in its order on the motion to dismiss: that the RICO actions and Section 1983 claims are time-barred, and that plaintiffs are immune from suit under state statutes for qualified directors serving without pay.  Defendants contend also that (1) plaintiffs' claims for lost profits related to a proposed television venture are speculative and without basis in the record, and that (2) defendants are free from punitive damages because of their claim of relevant state statutory immunity.  Defendants also raise, in their reply, their contention that (3) the court should not allow plaintiffs to use the date they filed notice of the lawsuit with the state as the commencement date of their lawsuit, but should instead use the

date of their complaint in this court as the suit's
commencement.

### Motion to Reconsider

Rule 54 of the Federal Rules of Civil Procedure
provides, in relevant part, that an interlocutory, non-
dispositive "order or other form of decision is subject to
revision at any time before the entry of judgment adjudicating
all the claims and the rights and liabilities of all the
parties."  Fed. R. Civ. P. 54(b).

The power to grant or deny reconsideration of an
interlocutory order is generally within the court's discretion.
Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1,
12 (1983) ("[E]very order short of a final decree is subject to
reopening at the discretion of the district judge."); see also
Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 514-15 (4th
Cir. 2003) (citing Fayetteville Inv'rs v. Commercial Builders,
Inc., 936 F.2d 1462, 1469 (4th Cir. 1991)).  Our court of
appeals has provided guidelines as to when reconsideration is
favored by noting that earlier decisions of a court become law
of the case and must be followed unless "(1) a subsequent trial
produces substantially different evidence, (2) controlling
authority has since made a contrary decision of law applicable

to the issue, or (3) the prior decision is clearly erroneous and would work manifest injustice." Sejman v. Warner-Lambert Co., Inc., 845 F.2d 66, 69 (4th Cir. 1988)(quoting EEOC v. International Longshoremen's Assoc., 623 F.2d 1054 (5th Cir. 1980); see also Official Committee of Unsecured Creditors of Cooler Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003) (reconsideration generally inappropriate unless there is "an intervening change of controlling law, . . . new evidence, or [a] need to correct a clear error or prevent a manifest injustice"). Defendants here have not presented any controlling authority issued since the previous opinion, and no trial has yet occurred in this case, so the Sejman opinion will counsel reconsideration of the previous order only if the court finds that it was "clearly erroneous and would work manifest injustice." 845 F.2d at 69.

Defendants continue to assert that all of plaintiffs' RICO injuries should be time-barred because some of them are. This constitutes a misunderstanding of the rules governing RICO claim accrual. Their motion cites the "injury discovery rule," which holds that "[p]rivate RICO suits are governed by a four-year statute of limitations, which runs from the date when the plaintiff discovered, or should have discovered, the injury." Mem. of Law in Supp. of Def. Mot. to Reconsider at *7 (quoting

6

<u>Potomac Elec. Power Co. v. Electric Motor and Supply</u>, 262 F.3d
260, 266 (4th Cir. 2001)).  But they wish for this court to hold
something very different - that a plaintiff may not sue based on
new RICO predicate acts causing new injuries within the last
four years if the plaintiff has previously suffered RICO
violations as part of the same pattern before that time.

The defendants ask the court to reject the "separate
accrual" rule, which states that "a cause of action accrues when
new [predicate] acts occur within the limitations period," based
on those new acts, "even if . . . other acts were committed
outside the limitations period."  <u>State Farm Mut. Auto. Ins. Co.</u>
<u>v. Ammann</u>, 828 F.2d 4, 5 (9th Cir. 1987)(Kennedy, J.,
concurring).  The separate accrual rule has been described as
the "second part of the 'injury discovery' rule," <u>Grimmett v.</u>
<u>Brown</u>, 75 F.3d 506, 510 (9th Cir. 1996), and in no way conflicts
with it.  Every court of appeals to consider this question has
rejected defendants' position and endorsed the separate accrual
rule.  <u>Rodriguez v. Banco Cent.</u>, 917 F.2d 664, 666 (1st Cir.
1990)("We find the reasoning of the Second Circuit in <u>Rhoades</u>
persuasive."); <u>Bankers Trust Co. v. Rhoades</u>, 859 F.2d 1096,
1102-05 (2d. Cir. 1988); <u>Annulli v. Panikkar</u>, 200 F.3d 189, 197-
98 (3d. Cir. 1999); <u>Love v. National Med. Enters.</u>, 230 F.3d 765,
773-75 (5th Cir. 2000); <u>McCool v. Strata Oil Co.</u>, 972 F.2d 1452,

7

1463-66 (7th Cir. 1992)("Following the First, Second, Eighth, Ninth, Tenth and Eleventh Circuits, we also apply a 'separate accrual' rule to civil RICO claims."); Grimmett, 75 F.3d at 510 (9th Cir. 1996); Cory v. Aztec Steel Bldg., Inc., No. 03-4193-RDR, 2005 WL 3682117, at *4 (D. Kan. Nov. 18, 2005)("In Bath, the Tenth Circuit also adopted the 'separate accrual' rule.")(citing Bath v. Bushkin, Gaims, Gaines & Jonas, 913 F.2d 817 (10th Cir. 1990)(per curiam)); Lehman v. Lucom, 727 F.3d 1326, 1331 (11th Cir. 2013)("[I]f a new RICO predicate act gives rise to a new and independent injury, the statute of limitations clock will start over for the damages caused by the new act.").[1] See also Klehr v. A.O. Smith Corp., 521 U.S. 179, 190 (1997)("[S]ome Circuits have adopted a 'separate accrual' rule in civil RICO cases, under which the commission of a separable, new predicate act within a 4-year limitations period permits a plaintiff to recover for the additional damages caused by that

---

[1] Several of the courts of appeals noted in this paragraph, following the lead of the Second Circuit in Bankers Trust Co. v. Rhoades, have adopted the broader position that even a "new and independent injury" from the same predicate act may ground a new lawsuit. Bankers Trust, 859 F.2d 1096, 1103 ("At a later date, when a new and independent injury is incurred from the same violation, the plaintiff is again 'injured in his business or property' and his right to sue for damages from that injury accrues at the time he discovered or should have discovered that injury."). If a new injury from past conduct can create grounds for a new legal claim, then, plainly, new injuries from new conduct must allow a new legal claim as well. See Love v. Nat'l Med. Enterprises, 230 F.3d at 775 (stating rule from Bankers Trust and applying it to injuries from new conduct).

act. . . . Thus, the Klehrs may point to new predicate acts that took place after [the date four years before the start of their lawsuit] . . . .")(citing cases from Seventh, Ninth, and Eleventh Circuits endorsing separate accrual rule, and citing also <u>Bingham v. Zolt</u>, 66 F.3d 553, 560 (2d Cir. 1995), which suggested even broader standing to sue on the basis of past acts).

Defendants believe that the Supreme Court's opinion in <u>Rotella v. Wood</u>, 528 U.S. 549, 555-56 (2000), supports their position.  They cite <u>Rotella</u> for the proposition that "a plaintiff who seeks to bring a civil RICO action must be diligent and must assert such an action within four years of the date of the first discovery of the pattern of racketeering activity," Def. Rep. to Pl. Resp. to Mot. for Summ. J. at *5. This contention has no basis in <u>Rotella</u>, which simply rejected a rule, then applied by some courts, that a RICO claim accrued for a particular injury when a plaintiff discovered that injury and a pattern of RICO violations, rather than simply when the plaintiff discovered the injury itself.  528 U.S. at 551 ("The commencement of petitioner's . . . action under [RICO] was timely only if the so-called 'injury and pattern discovery' rule governs the start of the 4-year limitations period.  We hold that it does not.").  The holding of <u>Rotella</u> is compatible with

the separate accrual rule.  Moreover, if Rotella had rendered the separate accrual rule impermissible, it would be curious indeed that courts of appeals continued to endorse the rule after Rotella was decided.  See, e.g., Lehman v. Lucom, 727 F.3d 1326; Love v. Nat'l Med. Enterprises, 230 F.3d 765; Takeuchi v. Sakhai, 227 F. App'x 106, 107 n.1 (2d Cir. 2007).

Defendants also cite the district court's opinion in CSX Transp., Inc. v. Gilkison, 71 Fed. R. Serv. 3d 1471 (N.D.W. Va. 2008), which they believe to have rejected the separate accrual rule at one stage of a lengthy proceeding.  But that portion of the decision was reversed (albeit on other grounds) by the Fourth Circuit in an opinion that did not reject the separate accrual rule.  CSX Transp., Inc. v. Gilkison, 406 Fed. Appx. 723, 728, 730 n.3 (4th Cir. 2010)("[W]e do not address CSX's argument regarding the separate accrual rule for RICO statute of limitations purposes.").  In fact, in Gilkison, the Fourth Circuit wrote as follows:

> [S]ince the issue may arise on remand, we do note our concern regarding the district court's apparent alternate holding that, "[b]ecause only one alleged act of racketeering activity is not time-barred, CSX has failed to show the requisite pattern to sustain its RICO claims." . . . [E]ven if a claim or claims are found to be time-barred, that fact alone does not make the claim ineligible as a predicate act to establish a RICO pattern.

> In order to demonstrate the requisite pattern of RICO
> activity, the statute permits the contemplation of
> acts within a ten year period.  18 U.S.C. § 1961(5).
> Thus, even assuming that only one of those acts
> occurred within the statute of limitations period,
> that would not defeat the existence of a RICO pattern
> provided the other predicate act took place within the
> applicable ten year period.  Whether all of the
> injuries might independently support an award of
> damages is a separate issue.

Id. at 730 n.3 (citation omitted).  This dictum suggests that even if some events are time-barred and thus cannot support the plaintiff's recovery, they can still be used to establish the "pattern" of events required under the RICO statute, so long as at least one event happened within the limitations period.  That is, of course, precisely what plaintiffs seek in this case.  It is unclear whether there is any daylight between the rule described in the Fourth Circuit's Gilkison opinion and the "separate accrual" rule, but, in any case, the comments suggest that defendants' argument lacks basis in rulings of our court of appeals.

It is noted that, at a later point in the district-level Gilikson proceedings, the district judge who authored the 2008 opinion declined to decide whether "the separate accrual rule applies," and explicitly noted that the Fourth Circuit had not taken a position regarding the separate accrual rule.  CSX Transp., Inc. v. Gilkison, No. 5:05-cv-202, 2013 WL 149608, at *4, *4 n.4 (N.D.W. Va. Jan. 14, 2013).  And, as this court noted

11

in its previous order, the Fourth Circuit has explicitly endorsed the separate accrual rule in antitrust law, the context from which the RICO limitations rules are drawn.  In re Cotton Yarn Antitrust Litig., 505 F.3d 274, 290-91 (4th Cir. 2007).

In short, defendants produce no authority persuading the court to reject the separate accrual rule.[2]  Adopting their position would not only be legally novel, but would also produce the absurd result of allowing defendants to break the RICO laws with impunity if they began acting illegally far enough in the past.  Statutes of limitations are meant to favor repose and the speedy presentation of claims, but defendants' proposed rule would prevent plaintiffs, in at least some circumstances, from suing based on illegal actions taken the day before a complaint is filed.  Such a result is not consistent with either of those values.

---

[2] Defendants cite a number of other Fourth Circuit cases in an attempt to bolster their position, but these cases simply reiterate the "injury discovery" rule, which, as the court explained above, does not conflict with the "separate accrual" rule.  See, e.g., Dickerson v. TLC The Laser Eye Ctr. Inst., Inc., 493 F. App'x 390 (4th Cir. 2012); Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc., 262 F.3d 260, 266 (4th Cir. 2001)("[T]he application of the statute of limitations essentially turns on the question of whether, with respect to each alleged injury, PEPCO knew or should have known of its injury prior to July 29, 1994")(emphasis added); CVLR Performance Horses, Inc. v. Wynne, 792 F.3d 469, 476 (4th Cir. 2015).  No circuit-level authority cited by defendants demonstrates a rejection of the separate accrual rule.

Defendants also contend that each item on plaintiffs'
long list of RICO violations in this case does not demonstrate a
new, independent predicate act and injury, but instead is "at
best, [a] recharacterization[] and continuation[]" of past
injuries.  Def. Repl. to Pl. Resp. to Mot. to Reconsider at *7.
Thus, in defendants' view, "Plaintiffs have not demonstrated new
and independent acts that are entitled to application of the
'separate accrual rule.'"  Id.

It is true that "recharacterizations" of past injuries
cannot support a new RICO claim, and some courts have also held
that "a 'continuation of damages into a later period will not
serve to extend the statute of limitations for a RICO action.'"
Lehman v. Lucom, 727 F.3d 1326, 1331-33; but see Bankers Trust,
859 F.2d 1096, 1102-05 (noting that new cause of action can
accrue based on "new and independent injury" from same
violation).  In Lehman, for example, the Eleventh Circuit held
that a plaintiff could not bring separate claims based on a
single improper property sale by contending that each small step
in the transaction, such as "sign[ing] off on" the sale and
"transfer[ring] tracts . . . to third party transferees," was
somehow separate from the overall act of "attempting to sell"
the property.  Lehman, 727 F.3d at 1332.  In this action,
however, plaintiffs' complaint plainly makes a series of

13

allegations describing independent legal violations, each of
which inflicted independent injuries upon defendants.  For
example, many of plaintiffs' allegations describe individual
acts of overcharging for the services of boxing officials on
specific dates or demanding free tickets, <u>see</u>, <u>e.g.</u>, Pl. Compl.
at *31-32.  Defendants' suggestion that these violations were
not independent of each other must be rejected.[3]

---

[3] Defendants appear also to state that, if all of plaintiffs'
RICO counts are sufficiently "related" to each other to form a
pattern, then each new event alleged cannot also be sufficiently
independent to support recovery under the separate accrual rule.
Def. Repl. to Pl. Resp. to Def. Mot. to Reconsider at *5-6
("Plaintiffs cannot have it both ways, either the RICO Act
applies and all predicate acts are part of a pattern of
racketeering activities or RICO does not apply and Plaintiffs'
claims must fail because the acts are not substantially related
and cannot be part of a civil RICO claim."); <u>see also</u> Def. Repl.
to Pl. Resp. to Mot. for Summ. J. at *6-7.

    This argument must fail.  First, the statute allows suit
based on a "pattern of racketeering activity," which is "two
acts of racketeering activity, one of which occurred . . .
within ten years . . . after the commission of a prior act."  18
U.S.C. § 1961.  If the statute of limitations for a "pattern"
expired four years after discovery of the first injury in the
pattern, no claim could ever lie for two events ten years apart
unless the first injury was not discovered until long after it
was inflicted.  Defendants' theory thus appears to be at odds
with the statute's language.  Moreover, the separate accrual
rule could never apply if events in all RICO patterns were so
related that no additional injury in a pattern could ever be
"new and independent."

14

Based on the foregoing reasoning, the court ORDERS that defendants' motion to reconsider the court's ruling on the motion to dismiss should be, and it hereby is, denied.

### Summary Judgment

A. Legal Standard

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the initial burden of showing — "that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies

15

this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).  Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.

B. Discussion

The court addresses each of defendants' arguments for summary judgment and partial summary judgment in turn.

1. Statutes of Limitations

The court considered defendants' arguments as to the governing limitations rules in the order on the motion to dismiss.  In this order, the court has again reviewed the time limitations as to the RICO claims.  Defendants' motion for summary judgment does not raise any new arguments worthy of discussion regarding the statutes of limitations for either the RICO claims or the claims brought pursuant to Section 1983.

16

Thus, the court adheres to the above discussion of the separate accrual rule for RICO claims, as well as the order disposing of the motion to dismiss.

### 2. Immunity under W. Va. Code § 55-7C-3

Defendants contend, as they did in their motion to dismiss, that they are immune under W. Va. Code § 55-7C-3, which states that "a qualified director shall not be held personally liable for negligence." Def. Mem. in Supp. of Mot. for Summ. J. and Partial Summ. J. at *16. The court discussed this matter at some length in its order regarding the motion to dismiss, and defendants' motion for summary judgment raises no new arguments on this point that are worthy of discussion.

### 3. Tolling under W. Va. Code § 55-17-3

Defendants contend that plaintiffs are mistaken in using the date that they notified the state of their intent to sue, rather than the date of their complaint, as the date on which this suit commenced. They state, in their briefing, that

> Plaintiff attempts to claim a tolling period from March 14, 2015 due to Plaintiffs' mistaken belief that it was necessary to file a "notice of intent to sue" as specified in W.Va. Code § 55-17-3. . . . Plaintiffs are incorrect in their reliance upon W.Va. Code § 55-17-3 to toll the filing date of their May 11, 2015 Complaint.

17

Def. Repl. to Pl. Resp. to Mot. for Summ. J. at *9. Defendants, in support of their view, cite Tiller v. W. Virginia Dep't of State Police, No. 5:13-CV-05385, 2013 WL 6036441 (S.D.W. Va. Nov. 13, 2013) and D.W. v. Walker, No. CIVA 2:09-CV-00060, 2009 WL 1393818, at *3 (S.D.W. Va. May 15, 2009), both of which held that the state statute does not toll applicable limitations periods for federal-court litigants.

Because defendants raised this argument for the first time in their reply, plaintiffs had no opportunity to respond to it in the summary judgment briefing, although plaintiffs could have requested permission to file a surreply. Inasmuch as defendants' position on this issue is well-supported both by an analysis of the applicable statute and the applicable case law, the court will consider it, even though the practice of raising arguments for the first time in reply briefs is strongly disfavored.

The language of § 55-17-3 dictates that it applies only to actions filed in state court. The statute requires litigants to file notice with the state before commencing "an action against" government agencies, and provides at least thirty days of tolling upon fulfillment of this requirement:

> Notwithstanding any provision of law to the contrary,
> at least thirty days prior to the institution of <u>an</u>
> <u>action</u> against a government agency, the complaining
> party or parties must provide the chief officer of the
> government agency and the Attorney General written
> notice, by certified mail, return receipt requested,
> of the alleged claim and the relief desired. . . . If
> the written notice is provided . . . any applicable
> statute of limitations is tolled for thirty days from
> the date the notice is provided and, if received by
> the government agency as evidenced by the return
> receipt of the certified mail, for thirty days from
> the date of the returned receipt.

W. Va. Code § 55-17-3 (emphasis added).  The statute defines an

"action" as a lawsuit filed in state court:

> "Action" means a proceeding <u>instituted</u> against a
> governmental agency <u>in a circuit court or in the</u>
> <u>supreme court of appeals</u>, except actions instituted
> pursuant to statutory provisions that authorize a
> specific procedure for appeal or similar method of
> obtaining relief from the ruling of an administrative
> agency and actions instituted to appeal or otherwise
> seek relief from a criminal conviction, including, but
> not limited to, actions to obtain habeas corpus
> relief.

W. Va. Code § 55-17-2 (emphasis added).  Because the statute

limits the pre-suit notice requirement, as well as the related

tolling provision, to suits "instituted . . . in a circuit court

or in the supreme court of appeals," it has no application to

suits filed in federal court.  Two courts in this district have

held as much.  <u>See</u> <u>Singh v. Nerhood</u>, No. 3:11-CV-00701, 2012 WL

4464025, at *4 (S.D.W. Va. Sept. 26, 2012); <u>D.W. v. Walker</u>, 2009

WL 1393818.

19

Moreover, the state statute cannot apply to federal Section 1983 claims, or, it seems, to RICO claims.  In Felder v. Casey, the United States Supreme Court ruled that state "pre-suit notice" statutes requiring persons to file documents with the state before suing do not apply to Section 1983 claims, regardless of whether the claims are filed in state or federal court.  487 U.S. 131 (1988).  The opinion in Felder noted that Section 1983 generally uses state statutes of limitation because Section 1983 itself does not contain a statute of limitation, and "statutes of limitation are among the universally familiar aspects of litigation considered indispensable to any scheme of justice."[4]  Id. at 140.  But "the absence of any notice-of-claim provision," on the other hand, "is not a deficiency requiring the importation of [state] statutes into the federal civil rights scheme."  Id. at 139. The Court pointed out that Congress did enact notice-of-claim and exhaustion requirements for some

---

[4] See 42 U.S.C. § 1988 ("[J]urisdiction . . . shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause. . . .")(emphasis added).

types of claims brought under Section 1983 – particularly for
claims brought by prisoners, 42 U.S.C. § 1997e – and so the
presumption should be that Congress did not wish for such
requirements to apply to claims under Section 1983 in general.
Id. at 148.

        Courts of Appeals have applied similar reasoning to
other federal statutes.  The Second Circuit has stated that
"when a federal action is brought in federal court, the court
has discretion to borrow from state law when there are
deficiencies in the federal statutory scheme," but that, without
Congressional intent to the contrary, "the absence of a notice-
of-claim provision generally does not render a federal statute
deficient."  Hardy v. New York City Health & Hosp. Corp., 164
F.3d 789, 793 (2d Cir. 1999).  In Hardy, the Second Circuit
determined that New York's notice-of-claim requirements could
still apply in suits brought under a federal statute, the
Emergency Medical Treatment and Active Labor Act ("EMTALA").
164 F.3d at 793-94.  Key to the court's opinion was that the
statute stated that damages should be "available . . . under the
law of the State in which the hospital is located." Id. (citing
42 U.S.C. § 1395dd(d)(2)(A)).  In the court's view, this text

indicated Congress's intent to allow notice-of-claim statutes to operate.[5]  Id.

In J.S. ex rel. Duck v. Isle of Wight Cty. Sch. Bd., our court of appeals considered whether "the Virginia notice requirement was applicable to federal claims under the Rehabilitation Act," 29 U.S.C. § 794.  402 F.3d 468, 475 (4th Cir. 2005).  The court asked whether "the Rehabilitation Act is deficient for the lack of a notice-of-claim provision," and determined that it was not, largely because "such rules are not 'necessary to the fair litigation' of the federal cause of action."  Id. (quoting Brown v. United States, 742 F.2d 1498, 1503 (1984)).

The opinion in Felder thus shows that, in the present case, no state notice-of-claim statute will apply to plaintiffs' Section 1983 claims.  On the reasoning of Felder and cases such as Hardy and Isle of Wight, at least one court has ruled that RICO claims are not subject to state notice-of-claim statutes.[6]

_____

[5] Our court of appeals has disagreed with the Second Circuit, and has held that EMTALA is not consistent with state notice-of-claim statutes.  Power v. Arlington Hosp. Ass'n, 42 F.3d 851, 866 (4th Cir. 1994) ("We do not read § 1395dd(d)(2)(A) as expressly or impliedly incorporating state-mandated procedural requirements for EMTALA claims.  The statute refers us to state law only in determining 'those damages available for personal injury' actions against hospitals, no further.").

[6] The application of notice-of-claim statutes to RICO may differ from the analysis for Section 1983 and certain other federal

NRP Holdings LLC v. City of Buffalo, No. 11-CV-472S, 2015 WL
9463199, at *4 (W.D.N.Y. Dec. 28, 2015)(noting "no evidence of
congressional intention to adopt a state law notice of claim
requirement").

        The conclusion that the West Virginia notice-of-claims
statute does not apply to this suit is consistent with decisions
of the federal courts in this district.  As defendants suggest
in citing Tiller and Walker, federal courts in West Virginia
have widely held that W. Va. Code § 55-17-3 has no application
to federal lawsuits.  Singh, 2012 WL 4464025, at *4; see also
Vaughan v. Sheely, No. 5:12-CV-123, 2013 WL 8182783, at *1
(N.D.W. Va. Aug. 12, 2013); cf. Downey v. S. Cent. Reg'l Jail
Auth., No. 2:13-CV-23595, 2014 WL 4852014, at *6 (S.D.W. Va.
July 30, 2014)("Although this action was instituted in the
Circuit Court of Kanawha County, in Felder v. Casey, 487 U.S.
131, 145 (1988), the United States Supreme Court made it clear
that 'Notice of Claim' statutes, such as the one at issue here,
and state immunity statutes, do not apply to claims raised under
42 U.S.C. § 1983, regardless of whether they are filed in

---

laws if RICO is determined not to be a "civil rights law" to
which Section 1988(a) applies.  See Isle of Wight Cty. Sch. Bd.,
402 F.3d at 475 (noting that the Section 1988(a) "deficiency"
analysis applied to the statute at issue because it was a "civil
rights" law); but see Hardy, 164 F.3d at 793 (applying
"deficiency" analysis without determining that statute at issue
implicated civil rights).

federal or state court."), report and recommendation adopted sub
nom. <u>Downey v. S. Cent. Reg'l Jail</u>, No. 2:13-CV-23595, 2014 WL
4852173 (S.D.W. Va. Sept. 29, 2014).[7]

A final question appears: even if the notice-of-claims
statute does not apply, may plaintiffs invoke its tolling
provision?  Courts that have considered this question
emphatically state that plaintiffs may not receive benefit of a
tolling provision accompanying a notice statute inapplicable to
their claims.  In <u>Day v. Moscow</u>, Judge Kearse considered whether
a plaintiff could use the tolling provision of a state notice
statute for a Section 1983 claim brought in federal court:

> Since the filing of a notice of claim was not a
> prerequisite to the federal-court suit, a municipality
> perforce could not require a delay of the commencement
> of a federal-court suit pending an examination based
> on such a notice. . . .  Since there was no statutory
> prohibition against a suit such as the present one in
> federal court, we conclude that under state law, the
> tolling provision . . . would not be deemed applicable
> . . . .  The purpose of a tolling provision is to
> assure that the claimant has the full period of time
> provided by a statute of limitations in which to bring
> his suit.  In the present case, no valid purpose would
> be served by enlarging the prescribed period to
> "compensate" for a disability that did not exist.

---

[7] The statute has evidently been used only to dismiss claims that
originate in state court and do not arise under Section 1983.
<u>Petersen v. W. Virginia Univ. Bd. of Governors</u>, No. 2:06-CV-
0664, 2007 WL 2220192 (S.D.W. Va. July 31, 2007).

955 F.2d 807, 814 (2d Cir. 1992).  See also Peoples v. Finney
Cty. Bd. of Comm'rs, 56 F.3d 78 (10th Cir. 1995)(unpublished
opinion); Silva v. Crain, 169 F.3d 608, 610 (9th Cir. 1999).

The reasoning of the Moscow decision is persuasive.
West Virginia's notice statute does not apply to plaintiffs'
claims in this case.  Thus, although the statute may toll the
limitations period for claims to which it applies, "no valid
purpose would be served by enlarging the prescribed period to
'compensate' for a disability that did not exist."  955 F.2d at
814.

Based on the foregoing, defendants' motion for summary
judgment will be granted insofar as it contends that plaintiffs'
claim was effectively filed on May 11, 2015, the date of the
complaint in this suit.  Both the four-year RICO statute of
limitations, and the two-year Section 1983 statute of
limitations, will be applied based on the date the complaint was
filed.

4. Claims of Lost Profits from Television Show

Defendants also take issue with plaintiffs' claim that
they lost the opportunity to create, and profit from, a reality
television show in April of 2013.  Defendants focus on two legal

25

requirements: first, the need to show that defendants' acts proximately caused the injury, and second, the need to give evidence for any damages sought beyond mere "speculation or conjecture." Def. Mem. at *10-15.

The RICO statute dictates that "[a]ny person injured in his business or property by reason of a violation of [the RICO laws] may sue therefor in any appropriate United States district court." 18 U.S.C. § 1964(c). "The quoted language requires the plaintiff to . . . show[] . . . that this injury was caused by the predicate acts of racketeering activity that make up the violation of § 1962." Brandenburg v. Seidel, 859 F.2d 1179, 1187 (4th Cir. 1988)(citing Nodine v. Textron, Inc., 819 F.2d 347, 348 (1st Cir. 1987)), overruled on other grounds by Quackenbush v. Allstate Ins. Co., 517 U.S. 706 (1996).

A plaintiff must "show[] that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258, 268 (1992). "[T]he legal," or proximate, "cause determination is properly one of law for the court," Mid Atl. Telecom, Inc. v. Long Distance Servs., Inc., 18 F.3d 260, 263 (4th Cir. 1994), and "[c]ausation principles generally applicable to tort liability must be considered applicable," Brandenburg, 859 F.2d at 1189. These may include "such factors

26

as the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection." Mid Atl. Telecom, 18 F.3d at 264 (quoting Brandenburg, 859 F.2d at 1189).

Our court of appeals "has not held that quantifiable damages are a necessary precondition to RICO liability; instead, [the Fourth] Circuit has formulated the requirement in terms of the necessity of proving some damages, not a specific amount." Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc., 262 F.3d 260, 265-66 (4th Cir. 2001)(emphasis in original)(citing Caviness v. Derand Resources Corp., 983 F.2d 1295, 1305 (4th Cir. 1993)). It is inappropriate for a district court to grant "summary judgment on the basis of inability to prove the amount of damages," because even "a nominal amount of damage is adequate to support liability." Id. at 266.

Although the events in Williamson are relatively muddled, the record, taken in the light most favorable to plaintiffs, reveals the following. By early 2013, plaintiff Smith had been "contacted by . . . all kinds of reality show producers," who "wanted [his company] to do a reality show with them." Smith Dep. at 105. After considering relationships with other production companies, Smith decided to "sign[] with" Authentic Entertainment, a production company responsible for

27

several hit television shows including "Here Comes Honey Boo
Boo," id. at 107, in the hopes that Authentic could design a
television show and market it to networks.  Authentic decided to
film a "sizzle," which is a short video intended to give
networks a preview of a proposed television show.  Kalister Dep.
at 12.

        To make the "sizzle," Authentic "spent the resources
to come in and film it," id. at 107-08 – indeed, Kyle Kalister,
the producer who led the project, estimates that the company
spent "close[] to $20,000" doing so, Kalister Dep. at 19.
Authentic determined that the "sizzle" would focus on only two
fights.  Smith Dep. at 108.  For each of the two fights,
Authentic would examine some type of personal dispute or
relationship between two "colorful characters," and then, at the
end, show their fight as "the resol[ution] [of] the dispute."
Id.

        The first fight would feature two half-brothers who
"lived together" and were experiencing an "inter-family
squabble" because "one of the brothers had slept with the other
brother's girlfriend."  Kalister Dep. at 37-38.  The second
fight involved a "turf war" between a man from Kentucky, Brian
Coleman, and a man from West Virginia, Garald Anderson.  Smith
Dep. at 108.  "Brian Coleman hated West Virginia," and evidently

28

stated, among other things, that "their football team sucks," and "Gerald [sic] Anderson didn't like him insulting the football team."  Smith Dep. at 108-09.  The second fight, between Anderson and Coleman, was most attractive for purposes of the "sizzle."  Kalister Dep. at 49.

The event in Williamson took place over two days.  On the first day, Coleman could not attend, because his grandmother had just passed away.  Smith Dep. at 111.  Anderson instead fought someone else on the first day.  He lost the bout, and was "knocked down [in] the second round," Smith Dep. at 111-12, although he was not knocked out and finished the fight.  During the match that night, neither the ringside physician, McDaniel Dep. at 23-24, nor the referee, Kuhn Dep. at 44-45, believed that Anderson was unfit to continue fighting after he was knocked down.

The next day, Smith intended to put on the fight between Anderson and Coleman.  But Commissioner Pauley, who had not attended the match the previous night, "sa[id] that he talked to his . . . referees and officials and that they felt that he could not . . . let [Anderson] fight."  Smith Dep. at 116.  Pauley's ostensible justification for doing so was that Anderson was defeated the previous night by knockout, thus suspending him from eligibility to fight for a period of time.

29

Id. Even though, during the previous night, Anderson had not been found to lose by knockout, Pauley "changed the outcome to a knockout," Smith Dep. at 116, evidently revising records to reflect this change.

Smith testified that such a change has "never happened in the history of me putting on 20,000-plus fights." Smith Dep. at 116-17. He states that this extreme action was taken because of a general bias against his amateur boxing exhibitions in favor of professional boxing. Smith Dep. at 117. Although Smith acknowledges that Pauley never stated to him directly that this action was taken to damage Smith's business, Smith Dep. at 196-97, he bases this assumption on a long history of the Commission's discriminatory, corrupt, and harmful conduct toward his company. See, e.g., Smith Dep. at 96 (stating that Commissioner Allred appeared at one of Smith's events in Williamson and told fans that Mixed Martial Arts was comparable to gay pornography, when they were wearing Mixed Martial Arts-related clothing); 85-86 (recounting discussion between Smith and Allred as to the Commission's requirement that Smith pay higher fees than other promoters); 77-78 (stating Smith's belief that the Commission discriminates against him because of his superior ability, compared to professional boxing engagements, to draw large audiences).

Smith states that he was unable to entertain the fight between Anderson and Coleman at any later time because the season for amateur fighting had ended, and because it would require tremendous resources and energy to "get the community to exhaust itself again to come back out to an event and fill the seats up."  Smith Dep. at 208.

Kalister, the television producer from Authentic, stated that networks had expressed "a strong interest" in making a show based on Smith's fights, and that Authentic "thought that we could get funding from them" to develop the show.  Kalister Dep. at 23.  He further states that his company thought the proposed show "would have a good chance of . . . getting some steam and selling," Kalister Dep. at 18.  Smith noted that the Discovery Channel "had even offered the production company money to film the sizzle for them to come out and do it, but [Authentic] wanted the exclusive."  Smith Dep. at 132.  That is, Authentic "decided to put their own money into it because they knew if they put their own money into it they could pitch it to multiple networks and not be limited to Discovery."  Id. at 132-33.

Smith states that, because Anderson was not permitted to fight, the "sizzle" "did not sell."  Smith Dep. at 132. Kalister agrees with Smith that, because the fight between

31

Coleman and Anderson was not filmed, the "sizzle" "was not what we intended when we went out," and the trailer "didn't get the payoff of the . . . fight."  Kalister Dep. at 24.  Authentic had "spent a lot of our time the day before . . . creating this story about these two guys . . . . so when [they] didn't get that fight, it just sort of let the tape die short at the end a little bit."  Kalister Dep. at 24-25.  Consequently, Smith claims, as damages, lost profits from any future reality television series.

Defendants strongly object to the suggestion that Pauley disqualified Anderson for malicious reasons.  They instead contend that "Pauley did not permit . . . Anderson to continue in the single-elimination tournament due to concern for his safety based upon reports Mr. Pauley received about the level of physical abuse Anderson had taken on the previous night when he lost his fight."  Def. Repl. to Pl. Resp. to mot. for Summ. J. and Partial Summ. J. at *16; see also Pauley Dep. at 56-57 ("For the safety of the fighter, I would not let him fight the next night.").  They also suggest that Pauley's disqualification of Anderson was related to irregularities with the officials' behavior caused by a cameraman's decision to enter the ring during Anderson's fight.  In a video that captured Pauley's explanation to Anderson that he had been

disqualified, Pauley states, "[a]fter talking to one of my
Deputies, the referees, and the judges, if it wasn't for the
interference in the ring you would have been counted out as a
knockout."  DVD: Rough n' Rowdy, Williamson, WV April 5-6, 2013
(on file with court).[8]  The conclusion that Anderson would have
been "counted out" appears to refer to the second round of the
fight the previous night, during which Anderson was knocked
down, and the referee spent some time removing the cameraman
from the ring, which may have given Anderson more time than
usual to resume fighting.  Id.

      At the summary judgment stage, the court must view the
record in the light most favorable to plaintiffs, and
defendants' contention thus cannot be accepted as a basis for
the court's decision.  As noted above, Pauley stated on video
that he disqualified Anderson because he "would have been
counted out as a knockout" absent interference by a cameraman in
the boxing ring.  The court, after viewing the video of the
match, doubts that it supports this contention, but recognizes
the question as one for jury resolution.  DVD: Rough n' Rowdy,
Williamson, WV April 5-6, 2013 (on file with court).  Further,

---

[8] The DVD of Anderson's fight in Williamson, and Pauley's
discussion with Anderson regarding his disqualification, is
marked as Exhibit C to Defendants' Reply to Plaintiffs' Response
to the Motion for Summary Judgment and Partial Summary Judgment
(ECF 34-3).

as mentioned above, the official and physician who were deposed stated that they did not tell Pauley that Anderson would have been counted out, or that he should be disqualified the following day.  Drawing all reasonable inferences in the plaintiff's favor, a jury could conclude that Pauley had no good reason to cancel the match, and that he may have done so to harm the plaintiffs.  Smith testified that the commissioners were aware that he was filming the reality trailer.  Smith Dep. at 110 ("[The commissioners] showed up dressed up because they knew they were going to be on a reality TV show.").  And, as stated above, Smith claims that he has been the victim of a long campaign of discrimination and harassment at the hands of the commission.  An ongoing campaign to harm Smith, combined with an injurious act that seems to escape justification, could give rise to the inference that the act was malicious.

In determining whether plaintiffs may sue based on the events of April 5-6, two separate questions appear: whether there is sufficient proximate causation to show that the claim may be brought at all, and whether plaintiffs may claim damages for projected future television profits.

As stated above, the Fourth Circuit requires, for a RICO claim to lie, that a plaintiff "prov[e] some damages, not a specific amount."  Potomac Elec. Power Co., 262 F.3d at 265-66.

These damages need not be quantifiable.  Id.  In Potomac Elec.
Power, for example, this requirement was fulfilled by showing
that plaintiffs did not receive the services that they ordered
from another business, and it was not required that quantifiable
monetary damages be shown therefrom.  262 F.3d at 265 ("PEPCO .
. . argues that it need not show that the motors' performance
was diminished or that the motors were less valuable as a result
of EMS's failure to perform repairs as specified.  We agree.").

        Here, plaintiffs could point to a number of concrete
and very direct damages, such as the harm to A.C.R. resulting
from its inability to put on the fights that, in its judgment,
would best provide value to its viewers and result in their
continued patronage over time.  Moreover, regardless of whether
television stations decided to create a show based on A.C.R.'s
fights, the company expended substantial time and energy in
producing the "sizzle," and because the Anderson/Coleman fight
did not happen, the "sizzle" itself was not completed as
planned.  The commissioners were likely aware of any damages
they caused to Smith's attempts to film the events, given their
knowledge that television producers were present and that
filming was ongoing.  See Smith Dep. at 110.  None of the
proximate causation factors mentioned by the Fourth Circuit's
RICO jurisprudence, including "the foreseeability of the

35

particular injury, the intervention of other independent causes, [or] the factual directness of the causal connection," **Mid Atl. Telecom**, 18 F.3d at 264, preclude these injuries from grounding a lawsuit.

Defendants contend, however, that plaintiffs cannot carry the burden as to proximate causation because any injury should be attributed to a number of causes other than their actions:

> 1) Plaintiffs passed on the opportunity to have Discovery Channel fund the sizzle reel for an exclusive "first pass" option to purchase the program in hopes of getting a better offer after filming was complete; 2) Plaintiffs' star fighter, Brian Coleman, did not show up for his fight causing producer Kyle Kalister to return to California without the footage that he was seeking; 3) Plaintiffs' other star fighter, Garald Anderson, unexpectedly lost his fight on the first night of the single-elimination tournament, thus jeopardizing his ability to continue to fight in the tournament; 4) on the following night, Defendant Doug Pauley did not permit Garald Anderson to continue in the single-elimination tournament due to concern for his safety based upon reports Mr. Pauley received about the level of physical abuse Anderson had taken on the previous night when he lost his fight; and lastly 5) Kyle Kalister left Authentic Entertainment a few weeks after . . . Plaintiffs' event and it is unclear whether the project would have continued without Mr. Kalister's involvement with it.

Def. Repl. to Pl. Resp. to Mot. for Summ. J. and Partial Summ. J. at *16.

Given that the court must view the facts in the light most favorable to plaintiffs, none of these five reasons can be accepted at this juncture. Each of the contentions relies upon inferences in defendants' favor, or upon assertions not supported by the record. First, the fact that Smith passed up the Discovery Channel's offer to fund the "sizzle" does not mean it was less likely to be successful. Nothing suggests that the identity of the person financing the "sizzle" would change its chances of becoming a television show. Indeed, the likelihood of success may well have been higher using Authentic's strategy of allowing multiple networks to consider the show. Second, Coleman's absence on the first night would not have mattered, except that Pauley prohibited Anderson from fighting on the second night. Absent Pauley's interference, Smith could have filmed the Anderson/Coleman fight on the second night and added his footage to the "sizzle." Third, Anderson's loss on the first night only mattered because Pauley claimed to disqualify him as a result of that loss, and, as the court discussed above, the record suggests that Pauley may not have had reason to disqualify Anderson. Fourth, as explained above, the court will not credit Pauley's explanation of events at this stage of the litigation. Fifth, the record does not suggest that Kalister's presence at, or absence from, Authentic Entertainment affected the likelihood of the show's success.

37

Having resolved the issue of proximate causation, the second question is what quantum of damages plaintiffs may claim based on this injury. The court is unable to determine, at this stage, whether plaintiffs' damages related to future television profits could be based on "competent proof, [rather than] mere speculation and surmise," Miller v. Asensio & Co., 364 F.3d 223, 232 n.6 (4th Cir. 2004). This matter will be more appropriately addressed in deciding the parties' motions in limine in preparation for trial. The court simply notes that claims for lost profits are not always disallowed in RICO actions. See, e.g., Terminate Control Corp. v. Horowitz, 28 F.3d 1335, 1338 (2d Cir. 1994); Maiz v. Virani, 253 F.3d 641, 664 (11th Cir. 2001).

Accordingly, the court will deny defendants' motion for partial summary judgment as to plaintiffs' ability to sue based on events in Williamson, West Virginia on April 5-6, 2013. The portion of defendants' motion related to the extent of damages suffered because of the event is denied without prejudice.

5. Immunity from Punitive Damages

Defendants claim also that they are immune from punitive damages because of relevant state statutes. Although

38

defendants do not refer to the particular section of the state code that supplies such immunity,[9] presumably they have in mind W. Va. Code § 55-17-4, which states that "No government agency may be ordered to pay punitive damages in any action."  The statute defines a "government agency" to include "a . . . public official named as a defendant or respondent," W. Va. Code § 55-17-2, which presumably would include defendants in this action.

For the defendants, however, the bitter comes with the sweet: the term "action" in W. Va. Code § 55-17-4 partakes of the same definition as it did in the above-discussed § 55-17-3, which includes only "a proceeding instituted . . . in a circuit court or in the supreme court of appeals," W. Va. Code § 55-17-2.  Because this case was filed in federal court, and not in "a circuit court" or "the supreme court of appeals," the present suit is not an "action" under § 55-17-4, and the prohibition of that section on punitive damages is thus inapplicable.

Plaintiffs also note that they have sued defendants in their individual as well as their official capacities, Pl. Resp.

---

[9] Defendants cite § 55-17-1(a), which states the findings of the legislature that support the enactments contained elsewhere in Article 17 of the statute.  W. Va. Code § 55-17-1(a)("The Legislature further finds that protection of the public interest is best served by clarifying that no government agency may be subject to awards of punitive damages in any judicial proceeding.").

to Def. Mot. Summ. J. at *9, a contention that is plainly
supported by the first page of the complaint, Pl. Compl. at *1
(stating, in caption of case, that each defendant is sued
"individually and as a West Virginia public official").  Because
W. Va. Code § 55-17-4 only bars punitive damages in suits
against a public official "in his or her official capacity,"
punitive damages would in any case be recoverable given the
individual-capacity claims.[10]  See, e.g., Lavender v. W. Virginia
Reg'l Jail & Corr. Facility Auth., No. 3:06-1032, 2008 WL
313957, at *9 (S.D.W. Va. Feb. 4, 2008)("As this Court has
determined that the Correctional Officers in this case are being
sued in their individual capacities and not their official
capacities, the Court finds punitive damages are not prohibited
under [W. Va. Code § 55-17-4]."); Rosenthal v. Jezioro, No.
2:08-CV-81, 2008 WL 4900563, at *6 (N.D.W. Va. Nov. 13,
2008)("The defendants' final argument is that the plaintiff's
claim for punitive damages is barred by West Virginia Code § 55-

---

[10] Defendants note that they have been sued in their individual
and official capacities, but suggest that punitive damages may
not be recovered against them because "Defendants . . . were
acting in their official capacities as public officials and
agents of the State of West Virginia in all counts of this
suit."  Def. Mem. in Supp. of Mot. for Summ. J. at *18.  The
fact that defendants were engaged in work on behalf of the state
during the events of the case does not mean that individual-
capacity claims cannot lie, see, e.g., Ex parte Young, 209 U.S.
123 (1908), and if such claims lie, they may support punitive
awards.

17-4(3) . . . . [T]he statute has no application to actions brought against the defendants in their individual capacity.").

### Conclusion

For the foregoing reasons, the court ORDERS that defendants' motion for partial summary judgment be, and it hereby is, granted, with respect to all of plaintiffs' Section 1983 claims based on conduct occurring before May 11, 2013, including Racketeering Activity Counts 1-38 as described in the complaint.[11]  The court further ORDERS that defendants' motion for partial summary judgment be, and it hereby is, denied without prejudice as it relates to the extent of damages suffered by plaintiffs based on conduct that occurred on April 5-6, 2013 in Williamson, West Virginia.  In all other respects, the court ORDERS that defendants' motions for summary judgment, partial summary judgment, and to reconsider the order as to the motion to dismiss, are denied.

---

[11] Although defendants are also entitled to dismissal of plaintiffs' RICO claims based on conduct occurring before May 11, 2011, this will not result in the dismissal of any currently-operative claims.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: June 1, 2016

John T. Copenhaver, Jr.
United States District Judge